1  Michael C. Ormsby
   United States Attorney
2  Eastern District of Washington
   Christopher E. Parisi
3  U.S. Department of Justice - Civil Division
   Trial Attorney - Office of Consumer Litigation
4  P. O. Box 386
   Washington, DC 20044-0386
5  Telephone:  (202) 598-2208

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

JAN 2 5 2013

SEAN F. McAVOY, CLERK
_____DEPUTY
SPOKANE. WASHINGTON

6

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | **CR-13-14-RMP** |
| | INDICTMENT |
| Plaintiff, | |
| | Vio:  18 U.S.C. § 371 |
| vs. | Conspiracy (Count 1) |
| | |
| LOUIS DANIEL SMITH, | 21 U.S.C. §§ 331(a) and |
| a/k/a Daniel Smith, a/k/a Daniel Votino, | 333(a)(2) |
| KARIS DELONG, a/k/a Karis Copper, | Misbranded Drugs |
| TAMMY OLSON, and CHRIS OLSON, | (Counts 2-5) |
| | |
| Defendants. | 18 U.S.C. § 545 |
| | Smuggling (Count 6) |
| | |
| | Forfeiture Allegation |

The Grand Jury Charges:

## <u>GENERAL ALLEGATIONS</u>

At all times material to this Indictment:

1.      The United States Food and Drug Administration ("FDA") was the federal agency responsible for protecting the health and safety of the American public by enforcing the Food, Drug and Cosmetic Act ("FDCA").  One main purpose of the FDCA was to ensure that drugs sold for administration to humans, or for consumption or other use by humans, were safe, effective, and bore labeling containing only true and accurate information.  The FDA's responsibilities under the FDCA included regulating the manufacture, labeling, and distribution of all drugs shipped or received in interstate commerce.

INDICTMENT - 1
01-23-13 MMS_Indictment.wpd

2.     Under the FDCA, upon first engaging in the manufacture, preparation, propagation, compounding, or processing of any drugs every person was required to immediately register his name, place of business, and all such establishments owned or operated by such person.  21 U.S.C. § 360(c).  The terms "manufacture, preparation, propagation, compounding, or processing" include repackaging or otherwise changing the container, wrapper, or labeling of any drug during the time between the original manufacture and the final sale to the ultimate consumer or user. 21 U.S.C. § 360(a)(1).

3.     The term "label" was defined as a display of written, printed, or graphic matter upon the immediate container of any article.  21 U.S.C. § 321(k). The term "labeling" was broader, and included all labels and other written, printed, or graphic matter upon any article, including drugs, or on any of its containers or wrappers, or accompanying such article. 21 U.S.C. § 321(m).

4.     Under the FDCA, drugs were defined as, among other things, articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man, 21 U.S.C. § 321(g)(1)(B); articles intended to affect the structure or any function of the body of man, 21 U.S.C. § 321(g)(1)(C); or articles intended for use as components of other drugs.  21 U.S.C. § 321(g)(1)(D).

5.     The "intended use" of a drug meant the objective intent of the persons legally responsible for the labeling of that drug. The intent was determined by such person's expressions, the circumstances surrounding the distribution of the drug, labeling claims, advertising matter, or oral or written statements by such persons or their representatives.  It might also have been shown by the circumstances that the drug was, with the knowledge of such persons or their representatives, offered and used for a purpose for which it was neither labeled nor advertised.  21 C.F.R § 201.128.

INDICTMENT - 2
01-23-13 MMS_Indictment.wpd

6.     Under the FDCA, the introduction, delivery for introduction, or causing the introduction or delivery for introduction into interstate commerce of a drug that was misbranded was prohibited. 21 U.S.C. § 331(a).

7.     A drug was misbranded if, among other things:

      a.     its labeling was false or misleading in any particular (21 U.S.C. § 352(a));

      b.     its labeling did not bear the name and place of business of the manufacturer, packer, or distributor, including the street address, city and zip code (21 U.S.C. § 352(b); 21 C.F.R. § 201.1(i)); or

      d.     it was manufactured, prepared, propagated, compounded, or processed in an establishment in any State not duly registered with the Secretary of Health and Human Services pursuant to 21 U.S.C. § 360 (21 U.S.C. § 352(o)).

### Importation of Drugs into the United States

8.     The United States Customs and Border Protection ("CBP"), an agency within the United States Department of Homeland Security ("DHS"), was the federal agency responsible for administering the laws governing the importation into the United States of goods and merchandise, including drugs.

9.     Federal law required that, among other things, all articles brought into the United States by any individual: (1) be declared to a Customs officer at the port of first arrival in the United States; (2) be declared on a conveyance en route to the United States on which a Customs officer was assigned for that purpose; or (3) be declared at a pre-clearance office in a foreign country where a United States Customs officer was stationed for that purpose.

10.     Whenever drugs falling under the jurisdiction of the FDA were declared or offered for import into the United States, CBP notified the FDA to determine whether the drug should be sampled and whether importation of the drug was lawful under the FDCA.

INDICTMENT - 3
01-23-13 MMS_Indictment.wpd

**The Parties**

11.    PGL International, LLC ("PGL") was a Nevada corporation incorporated on or about April 30, 2008, listing as its principal place of business 2533 North Carson Street, Carson City, Nevada. PGL listed this address on various corporate documents and correspondence, but never conducted business from a physical location in Nevada. PGL marketed and sold various health-related products, including the Miracle Mineral Solution ("MMS"), through the website projectgreenlife.com. On the website, PGL was, at times, referred to as "Project GreenLife – A Private Healthcare Membership Association."

12.    **LOUIS DANIEL SMITH**, also known as Daniel Smith and Daniel Votino, was a managing member of PGL. **SMITH** co-founded PGL and identified himself, at various times, as the "trustee" of "Project Greenlife – a Private Healthcare Membership Association." **SMITH** served as the director of PGL's operations and recruited family and friends to participate. **SMITH** used various email accounts, including daniel@projectgreenlife.com and dvotino@gmail.com, among others, to communicate with co-conspirators and customers.

13.    **KARIS DELONG,** also known as Karis Copper, was a managing member of PGL who frequently handled financial transactions for PGL. **DELONG** recruited family and friends to participate in PGL's business. At times, **DELONG** used the email accounts kariscopper@gmail.com and karis.pgl@gmail.com, among others, to communicate with co-conspirators, suppliers, and other individuals associated with MMS and PGL.

14.    **CHRIS OLSON** owned Chris Olson Customs and was the president of Belair Composites, a manufacturing firm located at 3715 East Longfellow Road, Spokane, Washington. As detailed below, **OLSON** manufactured and bottled MMS for PGL in a warehouse on this property.

15.    **TAMMY OLSON** handled customer care for PGL from at least October 2008 until the summer of 2011. During that time, **OLSON**

INDICTMENT - 4
01-23-13 MMS_Indictment.wpd

communicated with customers through various email accounts to assist them with purchases of MMS and other products. At times, **OLSON** used the email accounts mmsmiracle@gmail.com and customercare@projectgreenlife.com to communicate with co-conspirators and PGL customers. **OLSON**, in phone calls and emails with PGL customers, claimed MMS could successfully treat various diseases. **OLSON** also, at times, directed these customers to consume MMS to treat disease. In addition, **OLSON** wrote the "MMS Miracle Book," which detailed numerous uses of MMS to treat diseases. As detailed below, **OLSON** also obtained the domain name purestreamhealth.com and operated a website at that web address to sell MMS to consumers.

### The Drug

16.    MMS was a mixture of Sodium Chlorite and water. PGL and others marketed and sold MMS on the internet.

17.    Sodium Chlorite was a strong oxidizer. In contact with other materials, Sodium Chlorite could cause fire. Sodium Chlorite was harmful if swallowed and could cause digestive tract burns.

18.    When Sodium Chlorite was combined with citric acid, these ingredients produced Chlorine Dioxide. Chlorine Dioxide was a potent agent used in bleaching and stripping of textiles, pulp, and paper. It was also used as, among other things, a disinfectant, as it effectively kills pathogenic microorganisms such as fungi, bacteria, and viruses. As such, it was commonly used as a disinfecting water treatment.

19.    In humans, Chlorine Dioxide was a severe respiratory and eye irritant. Inhalation could cause coughing, wheezing, respiratory distress, congestion in the lungs, and death. Drinking Chlorine Dioxide could cause nausea, vomiting, diarrhea, dehydration, and symptoms of severe fluid depletion.

INDICTMENT - 5
01-23-13 MMS_Indictment.wpd

1

## COUNT 1
### Conspiracy
### (18 U.S.C. § 371)

2

3      20.    Paragraphs 1 through 19 of the General Allegations section of this

4  Indictment are re-alleged and fully incorporated herein by reference.

5      21.    From on or about September 11, 2004 to at least on or about July 16,

6  2012, in Spokane, in the Eastern District of Washington and elsewhere, defendants

7                  **LOUIS DANIEL SMITH,**
                   **KARIS DELONG,**
8                 **TAMMY OLSON, and**
                   **CHRIS OLSON**

9

10  conspired and agreed, together and with others known and unknown to the grand

11  jury, to:

12      (a)    commit an offense against the United States by introducing,

13  delivering for introduction, and causing the introduction and delivery for

14  introduction into interstate commerce, with the intent to defraud or mislead,

15  misbranded drugs (to wit:  MMS), in violation of Title 21, United States Code,

16  Sections 331(a) and 333(a)(2);

17      (b)    knowingly defraud the United States and its agencies by impeding,

18  impairing, and defeating the lawful government functions of the United States

19  Food and Drug Administration, specifically, the FDA's duty to protect the health

20  and safety of the public by ensuring that drugs marketed and distributed in the

21  United States are safe and effective for their intended uses, manufactured in

22  establishments which are registered with the Secretary of Health and Human

23  Services, and that the labeling of such drugs bears true and accurate information,

24  including the name and place of business of the manufacturer; and,

25      (c)    import merchandise contrary to law, and to receive, conceal, sell, and

26  facilitate the concealment and sale of smuggled merchandise, in violation of Title

27  18, United States Code, Section 545.

28

INDICTMENT - 6
01-23-13 MMS_Indictment.wpd

## PURPOSE OF THE CONSPIRACY

22.    It was the purpose of the conspiracy among **LOUIS DANIEL SMITH, KARIS DELONG, TAMMY OLSON, CHRIS OLSON**, and their co-conspirators to obtain the chemicals needed to manufacture the drug MMS without revealing to regulators and suppliers the true purpose of the chemicals; to use those chemicals to manufacture the drug MMS in a facility that was hidden from regulators; to offer MMS for sale on websites they had established; and to enrich themselves by obtaining money from the interstate sales of the misbranded drug MMS.

## MANNER AND MEANS

It was part of the conspiracy that:

23.    **LOUIS DANIEL SMITH** created and maintained various websites to market and sell MMS over the internet.  These websites included projectgreenlife.com, mmsmiracle.com, and mmsfornewbies.com, among others. The websites directed interested consumers to an online store where **SMITH** and his co-conspirators offered bottled MMS for sale.  The online store also offered MMS literature for sale.

24.    The PGL online store offered, among other literature, a pamphlet entitled "MMS for Newbies."  The "Newbies" pamphlet described various oral ingestion protocols for MMS.  The pamphlet also stated, "in addition to helping malaria sufferers, ClO2 [Chlorine Dioxide] had benficial [sic] impact on a wide variety of conditions alleged to be caused by other pathogens including viruses, mold, bacteria or fungi; diseases like: HIV/AIDS, Hepatitis, Typhoid, Cancers, Herpes, Pneumonia, Tuberculosis, Arthritis, Asthma, Seasonal Flu – even Bird and Swine Flu."

25.    **LOUIS DANIEL SMITH** and **KARIS DELONG** used an online electronic payment service, PayPal.com, to accept payment for online orders made through the PGL website.  **SMITH** and **DELONG** periodically transferred funds

INDICTMENT - 7
01-23-13 MMS_Indictment.wpd

1  from this PayPal account to various bank accounts they controlled.  **SMITH** and
2  **DELONG** used these funds to pay suppliers, manufacturers, and shippers, as well
3  as for their own personal benefit.

4      26.  **LOUIS DANIEL SMITH** opened two Stamps.com accounts to pay
5  postage for parcels shipped by PGL.  Stamps.com is an internet-based service that
6  allows customers to weigh, print, and pay for postage without traveling to a Post
7  Office.

8  Sources of Sodium Chlorite

9      27.  **LOUIS DANIEL SMITH** and his co-conspirators initially obtained
10  Sodium Chlorite from an Ogden, Utah chemical supply company.  Sodium
11  Chlorite was mixed with water to create MMS.

12      28.  In February 2008, the Ogden, Utah company's parent corporation
13  expressed concern that Sodium Chlorite was being used for human consumption.
14  The Director of Distributor Relations for the parent corporation wrote to the
15  Ogden, Utah company's Vice President of National Accounts in Pennsylvania.  In
16  the letter, the Director said, "[W]e have recently ascertained that some companies
17  or persons are marketing products containing Sodium Chlorite for human health
18  and ingestion applications.  However, as clearly explained in the Material Safety
19  Data Sheet (MSDS) for [the company's] product, Sodium Chlorite may be harmful
20  if swallowed and may cause death if used in applications not specifically listed on
21  the product label."

22      29.  On or about March 14, 2008, a salesperson for the Ogden, Utah
23  chemical supply company forwarded the February 2008 letter to **LOUIS DANIEL**
24  **SMITH**.  In response, **SMITH** emailed, "No issues, our product is labeled for
25  water purification."

26      30.  On or about March 14, 2008, **LOUIS DANIEL SMITH** created the
27  domain name pglwater.com.

28

INDICTMENT - 8
01-23-13 MMS_Indictment.wpd

31.    Material Safety Data Sheets ("MSDS") are a widely used system for cataloging information on chemicals, chemical compounds, and mixtures.  The MSDS generally contains instructions for the safe use and storage of a particular chemical, as well as the potential hazards associated with that chemical.  In May 2008, a salesman at the Ogden, Utah chemical supply company emailed **LOUIS DANIEL SMITH** a MSDS for Sodium Chlorite sold by the company.  The MSDS indicated: "Swallowing this material may be harmful or cause death.  Harmful effects include burns and permanent damage to the digestive tract, including the mouth, throat, stomach and intestines.  Symptoms may include severe abdominal pain and vomiting of blood."

32.    On or about December 9, 2008, the Ogden, Utah chemical supply company's parent corporation sent a letter to J.H. at "PROJECT GREENLIFE" at P.O. Box 25, 6772 Springdale Hunters Road, Hunters, Washington.  **LOUIS DANIEL SMITH** and **KARIS DELONG** lived at this address.  The parent corporation expressed concern that Project Greenlife sold Miracle Mineral Solution for human consumption.  The company warned the Sodium Chlorite purchased by Project Greenlife was a registered pesticide and should not be consumed by humans.

33.    **LOUIS DANIEL SMITH** sought new suppliers for Sodium Chlorite. **SMITH** also took steps to hide what PGL was doing by creating fake companies and websites to prevent suppliers from learning that PGL was selling Sodium Chlorite for human consumption.

34.    On or about December 12, 2008, **LOUIS DANIEL SMITH** emailed an MMS supplier named R.N.  **SMITH** asked R.N. if he knew any Sodium Chlorite suppliers that "have no hangups regarding the sale of NaClO2 [Sodium Chlorite]."  PGL employee J.L., in response to **SMITH's** email, wrote, "Like we discussed yesterday, it might not be a bad idea to consider setting up a

INDICTMENT - 9
01-23-13 MMS_Indictment.wpd

'ligitament'[sic] water purification company to secure SC.  It might not put off the inevitable, but it would prolong it a bit."

35.    On or about December 18, 2008, **LOUIS DANIEL SMITH** wrote a letter to the Ogden, Utah chemical supplier in response to the supplier's concerns about PGL's use of Sodium Chlorite in products intended for human consumption. **SMITH** responded, "MMS Pro is a professional grade water purification product. It is manufactured with the intent of making water potable."  The letter referenced the website pglwater.com.

36.    **SMITH** forwarded this December 18, 2008 letter to **KARIS DELONG** electronically via email.  In response, **DELONG** noted, "I particularly like the pglwater.com site."  In response to **DELONG, SMITH** emailed, "I had planning [sic] to put that site together the last time we got a letter from [the Ogden, Utah chemical supplier]."

37.    **LOUIS DANIEL SMITH** and **KARIS DELONG** purchased the domain name wastewatersys.com on or about February 23, 2009.  **SMITH** emailed details of the purchase to PGL employee J.L.

38.    On or about February 24 and 25, 2009, PGL employee J.L. emailed the Ogden, Utah chemical supply company to order Sodium Chlorite.  In one email, J.L. provided the chemical company salesperson an email address at "wastewatersys.com" and referenced a company called Waste Water Systems.

39.    At various times, **LOUIS DANIEL SMITH** emailed other MMS manufacturers and consumers who were seeking supplies of Sodium Chlorite.  In one such email, **SMITH** identified the Ogden, Utah chemical supply company as a source of Sodium Chlorite, but warned, "[i]t may be important to also point out that when working with [the company] we must be clear that our Sodium Chlorite requirements are for the manufacturing of a water purification product only – as [the company] is strictly prohibited from selling it for any other purpose than is listed on the label (MSDS)."

INDICTMENT - 10
01-23-13 MMS_Indictment.wpd

40.    On another occasion, **SMITH** emailed an MMS customer in Nicaragua and said, "[y]ou may order sodium chlorite in the US from the chemical manufacturer [Ogden, Utah chemical supply company] but must be sure to declare it for water purification and NOT for the manufacturing of a health product."

41.    On or about March 2, 2009, the Ogden, Utah chemical supply company emailed PGL employee J.L. and attached a questionnaire regarding PGL's February 24, 2009 Sodium Chlorite order.  The questionnaire requested information about the purchase, including the intended use of the Sodium Chlorite. In response, **LOUIS DANIEL SMITH** emailed the company salesperson and said, "We're gonna take a pass on this one with [the company].  We were able to secure a source from outside the country where the grief-o-meter is relatively low."  **SMITH** copied **KARIS DELONG** and PGL employee J.L. on the emailed response.

42.    On or about March 3, 2009, **LOUIS DANIEL SMITH** and PGL employee J.L. ordered Sodium Chlorite from an Alberta, Canada chemical supply company.  The owner of the Alberta, Canada company also manufactured MMS. At times, **SMITH** placed orders with the owner of the Alberta, Canada company using email from various accounts, including dvotino@gmail.com.

43.    **LOUIS DANIEL SMITH** and **KARIS DELONG** paid the Alberta, Canada chemical supply company by wire transfer for Sodium Chlorite.  The Sodium Chlorite was shipped by commercial carrier from Canada to the state of Washington.   These shipments of Sodium Chlorite were invoiced by the import broker to "PGL Wastewater Systems."  Material Data Safety Sheets provided by the Alberta, Canada company indicated the Sodium Chlorite was intended for use in wastewater treatment.

Manufacture and Shipment of MMS

44.    **LOUIS DANIEL SMITH** initially hired a Sedro Woolley, Washington company to manufacture MMS for PGL.  The Sedro Woolley

INDICTMENT - 11

1  company mixed Sodium Chlorite obtained by PGL with water to create MMS.
2  The finished MMS product was bottled by the Sedro Woolley company.  Finished
3  bottles of MMS were, at times, picked up by PGL employees including **SMITH**
4  and **KARIS DELONG**.  At other times, the Sedro Woolley company shipped the
5  finished, filled MMS bottles via commercial carriers to various locations at the
6  request of various PGL employees.  **SMITH** and **DELONG** paid the Sedro
7  Woolley company by check and wire transfer.  These payments were made from
8  accounts controlled by **SMITH** and **DELONG**.

9      45.  **LOUIS DANIEL SMITH** initially hired a shipping and fulfillment
10 company in Spokane, Washington, to fulfill MMS orders made through the PGL
11 website.  The shipping and fulfillment company employees accessed the
12 projectgreenlife.com website to review orders placed by consumers.  Once the
13 orders were obtained from the website, the employees shipped MMS and other
14 products to customers throughout the United States as well as internationally.  The
15 shipping and fulfillment company shipped the MMS orders using the U.S. Mail
16 and commercial carriers such as FedEx.

17     46.  **LOUIS DANIEL SMITH** and PGL employee J.L. directed the
18 shipping and fulfillment company to include the "MMS Simplified for Newbies"
19 pamphlet with each order of MMS shipped for PGL.  The pamphlet stated, among
20 other things, "…in addition to helping malaria sufferers, ClO2 [Chlorine Dioxide]
21 had benficial [sic] impact on a wide variety of conditions alleged to be caused by
22 other pathogens including viruses, mold, bacteria or fungi; diseases like:
23 HIV/AIDS, Hepatitis, Typhoid, Cancers, Herpes, Pneumonia, Tuberculosis,
24 Arthritis, Asthma, Seasonal Flu – even Bird and Swine Flu."

25     47.  **LOUIS DANIEL SMITH** recruited **TAMMY OLSON** to work as a
26 customer care representative for PGL.  **OLSON** assisted customers with orders,
27 handled complaints, and answered consumer questions.  At times, she
28

1  communicated with PGL customers using the email addresses

2  mmsmiracle@gmail.com and customercare@projectgreenlife.com.

3      48.    On or about March 24, 2009, **TAMMY OLSON**, using the address

4  mmsmiracle@gmail.com, emailed a potential Canadian consumer of MMS who

5  expressed concern that MMS was illegal in Canada. **OLSON** said, "MMS has

6  been banned for sale in Canada for over six months. We ship the MMS as water

7  purification drops also. We have not had any difficulty with your customs

8  department, getting product through the boarder [sic]. "

9      49.    On or about October 14, 2009, an individual from Costa Rica emailed

10  **LOUIS DANIEL SMITH** to inquire about distributing PGL's MMS. **SMITH**

11  forwarded the email to PGL employee J.L. for response. On or about October 15,

12  2009, PGL employee J.L. responded by email. J.L. said, "[A]s you know probably

13  the first hurdle you must "jump over" is customs in your region. I presume each

14  country in Central America may be a little different. Our main product is MMS,

15  and it is sold in the U.S. as a water purification product. Because of this, we

16  generally don't send the [J.H.] protocol (oral consumption) with MMS

17  international orders to help ease the importation regulations for international

18  countries."

<u>FDA Inspections of PGL's Supplier and Shipper</u>

20      50.    On or about August 10, 2010, the FDA inspected the shipping and

21  fulfillment company's warehouse in Spokane, Washington. Inspectors

22  interviewed employees and reviewed records related to the shipment of MMS and

23  other products for PGL. The shipping and fulfillment company stopped working

24  with PGL following the inspection.

25      51.    On or about August 18, 2010, the FDA inspected the Sedro Woolley,

26  Washington company's facilities. Inspectors interviewed employees and reviewed

27  records related to the production of MMS for PGL. The Sedro Woolley company

28  terminated the relationship with PGL prior to the inspection.

INDICTMENT - 13
01-23-13 MMS_Indictment.wpd

52.     Shortly after the FDA inspection of the Spokane, Washington shipping and fulfillment company, **LOUIS DANIEL SMITH** removed bottled MMS, MMS literature, and other products from the Spokane company's warehouse.

Post-Inspection Manufacture and Shipment of MMS

53.     Following the FDA inspections, PGL sought new suppliers and shippers to continue selling MMS.  **LOUIS DANIEL SMITH** and **KARIS DELONG** recruited family and friends to participate in their scheme to manufacture and ship MMS.

54.     Sometime after the FDA inspected the Sedro Woolley company, **CHRIS OLSON** agreed to produce MMS for PGL in a building located on his property at 3715 East Longfellow Road, Spokane, Washington.  At times, **OLSON** used the email address colson@belaircomposites.com to communicate with **LOUIS DANIEL SMITH** and others about MMS production.

55.     Sometime after the FDA inspected the Spokane, Washington shipping and fulfillment company's warehouse, **KARIS DELONG** recruited family member M.D. to ship MMS and other products ordered through the PGL website. M.D. obtained orders from the PGL website and shipped MMS to customers throughout the United States as well as internationally.  M.D. shipped MMS orders using the U.S. Mail and commercial carriers such as FedEx.  M.D. used the Stamps.com accounts controlled by **LOUIS DANIEL SMITH** to pay the postage for packages shipped through the U.S. Mail. **SMITH** and **DELONG** paid M.D. by transferring money directly to M.D.'s account from accounts **SMITH** and **DELONG** controlled.

56.     At various times following the FDA inspections, **LOUIS DANIEL SMITH, KARIS DELONG**, and M.D., among others, delivered packages containing MMS to Spokane, Washington Post Offices for shipment in interstate commerce.

INDICTMENT - 14
01-23-13 MMS_Indictment.wpd

57.    On or about June 30, 2011, federal agents searched the premises of 3715 Longfellow Road, Spokane, Washington.  As detailed above, this address was the location of Belair Composites and Chris Olson Customs.  **CHRIS OLSON** was the owner of Chris Olson Customs and a stakeholder in Belair Composites.  Inside a building on the property, agents located a large tank containing liquid Sodium Chlorite.  The tank bore labeling indicating it was shipped from the Alberta, Canada chemical supply company.  Agents also located bottling and labeling equipment, PGL labels, and other items associated with PGL's bottled MMS.

58.    After agents searched Chris Olson Customs at 3715 Longfellow Road, Spokane, Washington, both **LOUIS DANIEL SMITH** and **CHRIS OLSON** filed various documents with the United States District Court for the Eastern District of Washington.  In the filed documents, **SMITH** stated Chris Olson Customs was a "service provider" for the "Project GreenLife Private Membership Association," and **OLSON** stated Chris Olson Customs provided "contracted services" for PGL.

59.    **TAMMY OLSON** established the website purestreamhealth.com after federal agents executed search warrants at various locations in Spokane, Washington related to the production and shipping of MMS.  **OLSON** continued marketing and selling MMS to consumers through the purestreamhealth.com website.

60.    **LOUIS DANIEL SMITH, KARIS DELONG, TAMMY OLSON,** and **CHRIS OLSON** did not register their manufacturing facilities with FDA.

## OVERT ACTS

In furtherance of the conspiracy, **LOUIS DANIEL SMITH, KARIS DELONG, TAMMY OLSON,** and **CHRIS OLSON** committed the following overt acts, among others, in the Eastern District of Washington, and elsewhere:

INDICTMENT - 15
01-23-13 MMS_Indictment.wpd

61.   On or about September 11, 2004 defendant **LOUIS DANIEL SMITH** created the domain name projectgreenlife.com.

62.   On or about December 10, 2007 defendant **LOUIS DANIEL SMITH** opened Stamps.com account number XXX7224.

63.   On or about March 14, 2008, **LOUIS DANIEL SMITH** and **KARIS DELONG** purchased the domain name pglwater.com.

64.   On or about November 7, 2008, PGL paid the Sedro Woolley company $4,975.00 by wire transfer for the manufacture of MMS. **KARIS DELONG** controlled the originating account.

65.   On or about January 19, 2009, **LOUIS DANIEL SMITH** opened Stamps.com account XXX5760.

66.   On or about February 23, 2009, **LOUIS DANIEL SMITH** and **KARIS DELONG** purchased the domain name wastewatersys.com.

67.   On or about March 3, 2009, **LOUIS DANIEL SMITH** and PGL employee J.L. emailed the owner of a chemical supply company in Alberta, Canada. **SMITH** and J.L. ordered 32 drums of Sodium Chlorite for $10,368 USD.

68.   On or about March 4, 2009, **KARIS DELONG** wired $10,368 to the owner of the Alberta, Canada chemical supply company.

69.   On or about June 18, 2010, defendants **LOUIS DANIEL SMITH** and **KARIS DELONG** paid the Spokane shipping and fulfillment company $4,597.22 to ship MMS and other products in interstate commerce.

70.   On or about September 17, 2010, following the FDA inspection, defendant **LOUIS DANIEL SMITH,** removed bottled MMS, literature, and other PGL products from the shipping and fulfillment company's warehouse in Spokane, Washington.

71.   On or about November 1, 2010, defendants **LOUIS DANIEL SMITH** and **KARIS DELONG** caused a package containing MMS to be mailed to Oakland, California from Spokane, Washington.

INDICTMENT - 16
01-23-13 MMS_Indictment.wpd

72.     On or about November 12, 2010, defendants **LOUIS DANIEL SMITH** and **KARIS DELONG** caused a package containing MMS to be mailed to San Clemente, California from Spokane, Washington.

73.     On or about November 16, 2010, defendants **LOUIS DANIEL SMITH** and **KARIS DELONG** caused a package containing MMS to be mailed to San Clemente, California from Spokane, Washington.

74.     On or about February 11, 2011, **CHRIS OLSON**, using the account colson@belaircomposites.com, emailed **LOUIS DANIEL SMITH** at email addresses dvotino@gmail.com and daniel@projectgreenlife.com.  **OLSON** said, "We finished the 750 bottles of sodiun [sic] chlorite and the 750 bottles of Citric Acid Activator this weekend.  The total cost to you is $900.00 for the run."

75.     On or about June 30, 2011, defendants **LOUIS DANIEL SMITH** and **KARIS DELONG** caused packages containing MMS to be delivered to a United States Post Office in Spokane, Washington, for delivery into interstate commerce.

76.     On or about August 2, 2011, defendant **TAMMY OLSON** purchased the domain name purestreamhealth.com.

77.     On or about July 16, 2012, defendant **TAMMY OLSON** caused a package containing MMS to be mailed to Phoenix, Arizona from Nine Mile Falls, Washington.

All in violation of Title 18, United States Code, Section 371.

**COUNTS TWO THROUGH FIVE**
**Misbranded Drugs**
**(21 U.S.C. §§ 331(a) and 333(a)(2))**

78.     The allegations of paragraphs 1 through 19 and 23 through 60 of the indictment are re-alleged and fully incorporated herein by reference.

INDICTMENT - 17
01-23-13 MMS_Indictment.wpd

79.    On or about the dates below, in Spokane, in the Eastern District of Washington, and elsewhere, defendants

**LOUIS DANIEL SMITH,**
**KARIS DELONG,**
**TAMMY OLSON, and**
**CHRIS OLSON**

with the intent to defraud and mislead, introduced, delivered for introduction, and caused the introduction and delivery for introduction into interstate commerce, from the state of Washington to the states listed below, a drug, bottled MMS, that was misbranded: (1) as defined at Title 21, United States Codes, Section 352(b), in that the label did not bear the name and place of business of the manufacturer, and (2) as defined at Title 21, United States Codes, Section 352(o), in that the drug was manufactured in an establishment which was not registered with the Secretary of Health and Human Services, as required under Title 21, United States Code, Section 360:

| Count | Approximate Shipment Date | Detail | Defendants Charged |
|-------|---------------------------|--------|--------------------|
| 2 | Nov. 1, 2010 | Controlled purchase made by an FDA-OCI Special Agent and received in Oakland, California | **LOUIS DANIEL SMITH KARIS DELONG TAMMY OLSON** |
| 3 | Nov. 12, 2010 | Controlled purchase made by an FDA-OCI Special Agent and received in San Clemente, California | **LOUIS DANIEL SMITH KARIS DELONG TAMMY OLSON** |
| 4 | Nov. 16, 2010 | Controlled purchase made by an FDA-OCI Special Agent and received in San Clemente, California | **LOUIS DANIEL SMITH KARIS DELONG TAMMY OLSON** |
| 5 | June 30, 2011 | USPS Priority Mail parcel recovered at the Manito Post Office in Spokane, Washington addressed to A.Z. in Bozeman, Montana | **LOUIS DANIEL SMITH KARIS DELONG CHRIS OLSON TAMMY OLSON** |

All in violation of Title 21, United States Code, Sections 331(a) and 333(a)(2).

## COUNT SIX
### Smuggling
### (18 U.S.C. § 545)

80.    The allegations of paragraphs 1 through 19 and 23 through 60 of the indictment are re-alleged and fully incorporated herein by reference.

81.    From on or about May 18, 2011 to at least on or about June 30, 2011, in Spokane, in the Eastern District of Washington, and elsewhere, defendants

### LOUIS DANIEL SMITH,
### KARIS DELONG,
### TAMMY OLSON, and
### CHRIS OLSON

did fraudulently and knowingly import merchandise, Sodium Chlorite, contrary to 21 U.S.C. § 331(a), in that the Sodium Chlorite was a bulk drug ingredient that was misbranded pursuant to 21 U.S.C. §§ 352(a) and 352(f)(1), and did knowingly and fraudulently receive, conceal, buy, sell, and facilitate the transportation, concealment, and sale of this merchandise, after importation, knowing the same to have been imported and brought into the United States contrary to law.

All in violation of Title 18, United States Code, Section 545.

## FORFEITURE ALLEGATION
### Smuggling

82.    The allegations contained in Count Six of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 982(a)(2)(B) and 545 and Title 28, United States Code, Section 2461(c).

83.    Upon conviction of the offense alleged in Count Six of this indictment, the defendants **CHRIS OLSON**, **LOUIS DANIEL SMITH**, **TAMMY OLSON**, and **KARIS DELONG**, shall forfeit to the United States, pursuant to Title 18 § 982(a)(2)(B)., any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the smuggling offense, and, pursuant to 18 U.S.C. § 545 and 28 U.S.C. § 2461(c), any merchandise introduced

INDICTMENT - 19
01-23-13 MMS_Indictment.wpd

into the United States in violation of § 545, or the value thereof, including but not limited to the following:

      a.    Approximately $88.19 U.S. funds seized from Wells Fargo Bank account number XXXXXX0570 in the name of L. Daniel Smith and Karis Copper DeLong;

      b.    Approximately $10,144.43 U.S. funds seized from Wells Fargo Bank account number XXXXXX3298 in the name of Project Greenlife;

      c.    Approximately $12,129.21 U.S. funds seized from Wells Fargo Bank account number XXXXXX3496 in the name of PGL International, LLC; and

      d.    Approximately 5,019,000 Iraqi Dinar, with an approximate value of $3,287.45 in U.S. Currency, seized from 2019 West Riverside, Spokane, Washington.

    84.   If any of the property described above, as a result of any act or omission of the defendants:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third party;

      c.    has been placed beyond the jurisdiction of the court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), incorporated by Title 18,

INDICTMENT - 20
01-23-13 MMS_Indictment.wpd

1  United States Code, Section 982(b) and Title 28, United States Code, Section

2  2461(c).

3         All pursuant to 18 U.S.C. §§ 545 and 982(a)(2)(B) and 28 U.S.C. § 2461(c).

4         DATED this _23_ day of January, 2013.

5                                    A TRUE BILL

6

7

8

9  Michael C. Ormsby
   United States Attorney

10

11

12  Christopher Parisi
    Assistant United States Attorney

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INDICTMENT - 21
01-23-13 MMS_Indictment.wpd